[No. 28039. Department One. December 19, 1940.]

A. J. REINHART *et al., Respondents,* v. CENTENNIAL FLOURING MILLS COMPANY, *Defendant,* JOHNNIE HUGHES, *Appellant.*[1]

[1]Reported in 108 P. (2d) 377.

T. B. *Southard* and *John L. Dirks,* for appellant.

*Dyar & Aten* and *Floyd Underwood,* for respondents.

*Witherspoon, Witherspoon & Kelley,* for defendant Centennial Flouring Mills Company.

BLAKE, C. J.—Plaintiffs, Reinhart and Engelsen, brought this action in replevin against Centennial Flouring Mills Company for 1158 bushels, 13 lbs., of wheat delivered to the latter's warehouse in Almira by Emrys Hughes in August, 1936. Johnnie Hughes, brought in as an additional defendant, filed a cross-complaint by which he claimed ownership of one-half the wheat. Upon the issues so made up, the trial court made findings that Johnnie Hughes had no right, title, or interest in the wheat, and that plaintiffs were the owners of it by virtue of an assignment made to them by Emrys Hughes on September 30, 1936, subject to the rights of the Centennial Flouring Mills Company for its services as warehouseman. From judgment accordingly entered, Johnnie Hughes appeals.

Emrys and Johnnie were brothers, who for several years had been engaged in farming operations in the vicinity of Almira. Some of their operations had been carried on individually—some jointly. The wheat in question was grown on land which they held as ten-

ants in common under a lease for six years from North Pacific Bank. The lease, however, was not filed for record. The demised term began January 1, 1932.

The 1932 and 1933 crops were split three ways—one third to the landlord for rent and a third each to Emrys and Johnnie. The 1934 crop was so small that nearly all of it was kept and used for seeding the place in 1935. Emrys sold what was not used for seeding and kept the proceeds. The 1935 crop was harvested and hauled by Emrys to the Centennial warehouse. The Centennial bought the crop and made settlement with Emrys, Johnnie at no time making any claim to that crop or the proceeds from its sale. Again, in 1936, Emrys harvested the crop, consisting of 1158 bushels, 13 lbs., and had it hauled to the Centennial warehouse. A warehouse receipt was made out in his name, but was not delivered.

Shortly after the 1936 crop was delivered at the warehouse, respondents sued out a writ of garnishment upon judgments of the superior court of Grant county which they held against Emrys. No return was ever made to the writ, because, shortly after it was served, Emrys and respondents entered into negotiations for settlement of their differences. A settlement was consummated about noon on September 30th.

In the meantime, Johnnie had led the agent of the Centennial to believe that he was going to make some claim of interest in the wheat. The agent advised respondents of Johnnie's attitude, but Johnnie himself did not communicate with them. That he knew, however, of the writ of garnishment and of the negotiations for settlement going on between Emrys and the respondents, there can be no doubt.

Under the terms of the settlement, Emrys transferred to respondents "all the vendor's [his] right,

title and interest in any and all grain now stored with or in the possession of the Centennial Flouring Mills Co.," in consideration of the release of the judgments held by respondents, which were in the approximate amount of twelve hundred dollars. Releases of the judgments were executed by respondents and delivered to Emrys when they received the bill of sale.

As we have said, the transaction was completed about noon of September 30th. Shortly after noon, the bill of sale was brought to the attention of the agent of the Centennial at the warehouse. Then Johnnie came to town in response to a telephone call from Emrys. Three hours later, he served written notice on the agent of the Centennial that he was the owner of one-half of the 1158 bushels of wheat. He explained the delay in serving the notice because of the time consumed in preparing it. (The notice consisted of less than two hundred words and was prepared by the same attorney who prepared the assignment and releases for Emrys and respondents.) In the meantime, Emrys had disappeared. When respondents learned of the notice served by Johnnie on the Centennial, one of them immediately called the clerk of the superior court at Ephrata to forestall the filing of the releases of their judgments. But they were too late. Emrys had come and gone.

We understand appellant's position to be that, since the crop was grown on land held by him and Emrys as tenants in common, it was their common property; that, being such, Emrys could not dispose of appellant's interest in it without his authorization. We think the position to the extent stated is sound. The crop was common property. *Washburn-Wilson Seed Co. v. Alexie,* 54 Idaho 727, 35 P. (2d) 990. Also, as a general proposition, a tenant in common cannot dispose of his cotenant's interest in the common prop-

erty without previous authorization or subsequent ratification by the latter. 62 C. J. 533; *Rowe v. James,* 71 Wash. 267, 128 Pac. 539; *Tungsten Products, Inc. v. Kimmel,* 5 Wn. (2d) 572, 105 P. (2d) 822.

While one tenant in common may not, by disposing of the common property, estop his cotenant from claiming his rights in it, the latter, by his own acts and conduct, may estop himself from insisting upon his rights. And this rule is particularly applicable where he has, by his acts and conduct, assisted his cotenant in perpetrating a fraud upon a third party. 62 C. J. 560; *Ryason v. Dunten,* 164 Ind. 85, 73 N. E. 74; *Dwight v. Giebisch,* 77 Ore. 254, 150 Pac. 749.

We have no hesitancy in invoking this doctrine of estoppel against appellant here. We think the unadorned facts, which we have narrated, demonstrate that he conspired with Emrys to defraud respondents. That respondents thought they were getting all of the 1158 bushels of wheat in consideration of releasing their judgments against Emrys, cannot be doubted. Nor can it be doubted that Emrys, with Johnnie's acquiescence and assistance, fostered that belief until the settlement was consummated. We use the term *assistance* advisedly. We think the only inference that can be drawn from the fact that Johnnie did not give notice of his claim of ownership to the Centennial for more than three hours after Emrys obtained the releases of the judgments was to give the latter time to get to Ephrata and file them before respondents could take any action toward repudiating them.

Judgment affirmed.

MILLARD, MAIN, STEINERT, and ROBINSON, JJ., concur.